**Annex 1**

**Memorandum of Law in Support of First Amended Joint Plan of Reorganization Plan of Merrimac Paper Company, Inc., Holyoke Card Company, Inc., and Aquamac Corporation, as Modified, with attached exhibits**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## WESTERN DIVISION

| | |
|---|---|
| In re: )<br><br>)<br><br>)<br>MERRIMAC PAPER COMPANY, INC., )<br>    Et al. )<br><br>)<br>    **Debtors** )<br><br>) | **Chapter 11**<br>**Case No. 03-41477-JBR through**<br>**Case No. 03-41479-JBR**<br><br>**Jointly Administered** |

### MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF FIRST AMENDED JOINT REORGANIZATION PLAN OF MERRIMAC PAPER COMPANY, INC., HOLYOKE CARD COMPANY, INC., AND AQUAMAC CORPORATION, AS MODIFIED

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") submit this Memorandum of Law ("Memorandum"): (i) in support of confirmation of the First Amended Joint Reorganization Plan of Merrimac Paper Company, Inc., Holyoke Card Company, Inc., and Aquamac Corporation, as modified (as amended and modified, the "Joint Plan")[1], pursuant to section 1129 of title 11, United States Code (the "Bankruptcy Code"); and (ii) in response to certain objections to confirmation of the Joint Plan filed by certain parties.   Concurrently with the filing of this Memorandum, the Debtors have filed with the Court: (i) the Affidavit of Donald Plummer in Support of Confirmation of First Amended Joint Reorganization Plan of Merrimac Paper Company, Inc., Holyoke Card Company, Inc., and Aquamac Corporation, as modified  (the "Plummer Affidavit"); and (ii) the Report of Plan Voting.

---

[1] Capitalized terms not otherwise defined in this Memorandum shall have the meanings ascribed to them in the Joint Plan.

## PRELIMINARY STATEMENT

The Joint Plan represents the product of several months of extensive negotiations among the Debtors, the Official Committee of Unsecured Creditors ("Committee"), and Summitbridge Global Investments, LLC ("Summit"), the primary secured creditor in these cases and has the support of the Committee and Summit.

The Joint Plan provides for an immediate payment to Class 6 Nonpriority Unsecured Claim holders of $425,000, with an additional $125,000 to be paid within one year of the Effective Date.    The Joint Plan provides for the subordination of Class 7 Stock Repurchase Claims to Class 6 Nonpriority Unsecured Claims.    The only unresolved objections to confirmation of the Joint Plan are those filed by the Stock Repurchase Claim holders who have opposed subordination of their claims.  If the proposed subordination is not approved, the Committee has agreed to a Joint Plan modification whereby the Class 7 claims shall participate equally with the Class 6 Claims in the available distribution.  Consequently, the Joint Plan is confirmable irrespective of the outcome of the litigation respecting subordination of the Stock Repurchase Claims.

The Debtors have secured the necessary acceptances to Joint Plan confirmation as required by 11 U.S.C. §1126.    All conditions required for confirmation have been satisfied, and the Joint Plan should be confirmed.

## FACTS

The facts pertinent to confirmation of the Joint Plan are set forth in the Plummer Affidavit and in the Disclosure Statement for the First Amended Joint Reorganization Plan of Merrimac Paper Company, Inc., Holyoke Card Company, Inc., and Aquamac

Corporation (as amended, the "Disclosure Statement"), both of which are incorporated by reference in this Memorandum.

## PROCEDURAL HISTORY AND BACKGROUND

On March 17, 2003 (the "Petition Date"), Merrimac Paper Company, Inc. ("MPC"), Holyoke Card Company, Inc. ("HCC"), and Aquamac Corporation ("Aquamac" and together with MPC and HCC, the "Debtors") filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Subsequent to the Petition Date, the Debtors continued to operate their businesses and manage their properties as Debtors-in-Possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. On March 26, 2003, the Office of the United States Trustee appointed the members of the Committee.

MPC owns and operates a paper mill in Lawrence, Massachusetts and is currently owned nearly hundred percent (100%) by its employees and former employees pursuant to an employee stock ownership plan ("ESOP"). As of the Petition Date, MPC had three wholly-owned subsidiaries: HCC, Aquamac, and PPC.

In May 2000, MPC acquired the assets of Holyoke Card and Paper Company ("HCP"), based in Springfield, Massachusetts. The name of the acquiring entity was later changed to Holyoke Card Company, Inc. HCC specializes in lamination, coating, and embossing of paper and paperboard.

Aquamac operates a hydroelectric power producing facility and equipment adjacent to, and for the benefit of, the MPC facility. Aquamac operates four waterwheels, three of which it owns and one of which is leased from MPC. PPC formerly operated a

paper mill in Pepperell, Massachusetts. PPC terminated operations in year 2002, and its assets were sold pursuant to a secured party sale. PPC is not a debtor before this Court.

On or about August 4, 2003, the Debtors filed the Joint Plan and Disclosure Statement. A hearing on the adequacy of the Disclosure Statement was held on or about September 3, 2003. After a hearing the Disclosure Statement was approved on September 8, 2003. The Debtors thereafter solicited acceptances and rejections of the Joint Plan from holders of impaired claims in accordance with the terms of the order approving the Disclosure Statement (the "Disclosure Statement Order"). The Disclosure Statement Order established October 14, 2003 as the voting deadline as well as the deadline for filing objections to the Joint Plan.

As discussed in greater detail in the Report of Plan Voting filed contemporaneously herewith, Classes 1, 2, 3, 4, 5, 6, 9, and 10 have either voted to accept the Joint Plan or are deemed to have voted to accept the Joint Plan.[2] Classes 7 and 8 are deemed to have rejected the Joint Plan. The Debtors are able to satisfy the criteria for confirmation provided for in Section 1129(b) of the Bankruptcy Code.

Six objections have been filed to the Joint Plan. As addressed in more detail in Section IV of this Memorandum, two of the objections have been resolved and the remaining objections should be overruled. If the Court determines that the Class 7 Stock Repurchase Claims should not be subordinated, holders of Class 7 Claims shall participate in the dividend payable to Class 6 Claim holders.

---

[2] Class 6 Claim holders initially voted 29 to 19 in favor of rejecting the Joint Plan. After consideration of the Joint Plan modifications which substantially increased the dividend payable under the Joint Plan, several creditors altered their votes such that a majority has now voted in favor of accepting the Joint Plan.

## ARGUMENT

### I.   THE JOINT PLAN MEETS EACH OF THE REQUIREMENTS FOR CONFIRMATION UNDER 11 U.S.C. § 1129

To obtain confirmation of the Joint Plan, the Debtors must demonstrate that the Joint Plan satisfies each of the requirements of 11 U.S.C. § 1129. As set forth in this Memorandum, the Plummer Affidavit, and the Report of Plan Voting, the Joint Plan satisfies these requirements and should be confirmed.

#### A.   Section 1129(a)(1) — The Joint Plan Complies with the Applicable Provisions of Title 11

Section 1129(a)(l) of the Bankruptcy Code provides that the Joint Plan may be confirmed only if the Joint Plan "complies with the applicable provisions of this title." The legislative history of section 1129(a)(1) indicates that the primary focus of this requirement is to ensure that the form of the Joint Plan complies with the provisions of section 1122 (classification of claims and interests) and section 1123 (contents of a plan) of the Bankruptcy Code. See S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5913; H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5962, 6368; see also In re PWS Holding Corp. Brunos. Inc., 228 F.3d 224, 243 (3d Cir. 2000) ("[t]his requires that the plan conform to the applicable provisions of Title 11"); Kane v. Johns-Manville Corp., 843 F.2d 636, 648-49 (2d Cir. 1988) (legislative history indicates that section 1129(a)(1) was intended to require compliance with sections 1122 and 1123); In re Leroux., 1997 WL 375677, *9, 10 (Bankr. D. Mass. 1997), affd Summit Inv. and Development Corp. v. Leroux, 69 F.3d 608 (1st Cir. 1995).

1.    **Section 1122 - Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that the claims or interests within

a given class must be "substantially similar" to the other claims or

interests in that class and that "all creditors of equal rank with claims against the same

property should be placed in the same class."    <u>Granada Wines Inc. v. New England

Teamsters and Trucking Indus. Pension Fund,</u> 748 F.2d 42, 46 (1st Cir. 1984); 11 U.S.C.

§1122(a).

The Joint Plan properly classifies Claims and Equity Interests. Article II of the

Joint Plan provides for the separate classification of Claims and Equity Interests into ten

(10) distinct Classes based on differences in their legal nature or priority:[3]

(i)      Summit Secured Claim (Class 1);

(ii)     City of Lawrence Secured Claim (Class 2);

(iii)    City of Springfield Secured Claim (Class 3);

(iv)     Other Secured Claims (Class 4);

(v)      Other Priority Claims (Class 5);

(vi)     Nonpriority Unsecured Claims (Class 6);

(vii)    Stock Repurchase Claims (Class 7);

(viii)   MPC Equity Interests (Class 8);

(ix)     HCC Equity Interests (Class 9); and

(x)      Aquamac Equity Interests (Class 10).

---

[3] In accordance with 11 U.S.C. § 1123(a)(i), administrative expense claims and priority tax claims have not been classified.

This classification structure is proper because each Class under the Joint Plan differs in legal character or nature. Classes 1 through 4 represent Secured Claim holders. Each Secured Claim holder retains different Collateral, warranting separate classification. Class 5 consists of Other Priority Claims which shall be paid in full on the Effective Date as required by 11 U.S.C. §1129(a)(9).

Nonpriority Unsecured Claims are classified in Class 6 and shall receive their <u>pro rata</u> distribution of $550,000 to be paid under the Joint Plan. Class 7 Stock Repurchase Claims shall be subordinated to the Claims of Class 6 creditors and shall not receive or retain any property under the Joint Plan. As discussed in greater detail in Section IV of this Memorandum, the Stock Repurchase Claims are properly subordinated under 11 U.S.C. §510 to the claims of unsecured creditors because such Claims originate from equity interests. Consequently, the legal character of the Stock Repurchase Claims is such as to "accord them a status different from the other unsecured creditors." <u>Granada Wines</u>, 748 F.2d at 46 (internal citations omitted).

Classes 8 through 10 represent the Equity Interests of the three Debtors.

All Claims within each Class are substantially similar to the other Claims in that Class. Claims and Equity Interests within a Class are treated equally. Accordingly, the classification structure set forth in the Joint Plan is proper, thereby satisfying the requirements of 11 U.S.C. § 1122.

2.      **The Joint Plan Meets the Requirements of 11 U.S.C. § 1123(a)**

Section 1123(a) of the Bankruptcy Code identifies seven requirements for the contents of the Joint Plan. As shown in sequence below, the Joint Plan fully complies with each of these requirements.

### a.    Section 1123(a)(1) — The Joint Plan Designates Classes of Claims

Section 1123(a)(l) requires that the Joint Plan designate classes of claims and interests, other than claims of a kind specified in 11 U.S.C. § 507(a)(l) (administrative expense claims), 11 U.S.C. § 507(a)(2) (claims arising under the "gap" period in an involuntary case), and 11 U.S.C. § 507(a)(8) (tax claims). Article II of the Joint Plan designates ten (10) Classes of Claims and Equity Interests, other than Administrative Expense Claims and Priority Tax Claims.  The Joint Plan therefore complies with 11 U.S.C. § 1123(a)(1).

### b.    Section 1123(a)(2) — The Joint Plan Specifies Unimpaired Classes

Section 1123(a)(2) requires that the Joint Plan "specify any class of claims or interests that is not impaired under the plan." The Joint Plan meets this requirement because it specifies that Class 5 is not impaired.

### c.    Section 1123(a)(3) — The Joint Plan Specifies the Treatment of Impaired Classes

Section 1123 (a)(3) requires that the Joint Plan "specify the treatment of any class of claims or interests that is impaired under the Joint Plan." The Joint Plan specifies the treatment of all impaired classes (Classes 1, 2, 3, 4 , 6, 7, 8, 9, and 10) in Article IV, thus satisfying this requirement.

### d.    Section 1123(a)(4) — The Joint Plan Provides for the Same Treatment of Claims Within the Same Class

Section 1123 (a)(4) requires that the Joint Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." Article

TRA 1521530v4                                    8

IV of the Joint Plan complies with this provision because all holders of Claims and Equity Interests within a particular Class are receiving identical treatment under the Plan (unless the holder of a particular Claim or Equity Interest has agreed to a less favorable treatment with respect to such Claim or Equity Interest).

e. **Section 1123(a)(5) — The Joint Plan Provides Adequate Means for its Implementation**

Section 1123 (a)(5) requires that the Joint Plan "provide adequate means for its implementation". Article V of the Joint Plan provides the appropriate means for implementation of the Joint Plan. Such measures include: (a) the assent by Summit, the holder of a Lien upon the Debtors' cash collateral, to the payment on the Effective Date of those obligations arising under the Joint Plan based upon the Debtors' representation respecting available funds; (b) the retention of substantially all of the Debtors' assets by the Reorganized Debtors; (c) the establishment of a Class 6 Trust to pursue certain avoidance claims, resolve disputed Unsecured Claims, and oversee the distribution of funds to Class 6 Claim holders; (d) the substantive consolidation of the Debtors for distribution purposes only; (e) the termination of outstanding Equity Interests; and (f) the issuance of New Common Stock.

f. **Section 1123(a)(6) — The Joint Plan Provides for Required Charter Provisions**

Section 1123 (a)(6) of the Bankruptcy Code requires that the Joint Plan provide for the inclusion of provisions in a corporate debtor's charter prohibiting the issuance of certain nonvoting securities and the establishment of an appropriate distribution of voting power as to the several classes of securities. Article V, Section B of the Joint Plan

provides for modification of the Debtors' by-laws and articles of organization to comply with the provisions of Section 1123(a)(6).

### g. Section 1123(a)(7) — The Joint Plan Provides for the Selection of Officers and Directors

Section 1123(a)(7) of the Bankruptcy Code requires that the Joint Plan contain only provisions that are consistent with the interests of creditors and with public policy with respect to the manner of selection of any officer, director or trustee.   The Debtors disclosed the identity and affiliations of the post-Effective Date board of directors and senior officers in the Joint Plan and the Supplement to the Joint Plan (the "Plan Supplement").  The appointment of these individuals is consistent with the interests of the Debtors' creditors and public policy.   Thus, the Joint Plan satisfies 11 U.S.C. § 1123(a)(7).

### 3. Section 1123(b) - Permitted Contents of a Plan

Section 1123(b) identifies various discretionary provisions that may be included in the Joint Plan, provided they are "not inconsistent with" applicable provisions of the Bankruptcy Code.   As permitted under Section 1123(b), the Joint Plan provides for impairment of certain Classes of Claims and Equity Interests, assumption or rejection of executory contracts and unexpired leases, the retention of certain causes of action by the Reorganized Debtors and the Class 6 Trustee, and the modification of the rights of certain secured and unsecured Claim holders.

The Joint Plan complies with Sections 1122 and 1123 of the Bankruptcy Code, and all other applicable provisions of the Bankruptcy Code; therefore, the Joint Plan satisfies the requirements of 11 U.S.C. §1129(a)(1).

**B.      Section 1129(a)(2) — The Debtors Have Complied with All Applicable Provisions of Title 11**

While Section 1129(a)(1) focuses on the Joint Plan's compliance with the Bankruptcy Code, Section 1129(a)(2) focuses on the Debtors' compliance with the Bankruptcy Code. The legislative history of this provision indicates that its principal purpose is to ensure that the proponent complies with the disclosure and solicitation requirements set forth in 11 U.S.C. § 1125. See S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912 ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6368.

Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of the Joint Plan from holders of claims or interests "unless, at the time of or before such solicitation, there is transmitted to such holder the Joint Plan or a summary of the Joint Plan, and a written disclosure statement approved......by the court as containing adequate information." 11 U.S.C. § 1125(b). This Court entered the Disclosure Statement Order on or about September 8, 2003, which, among other things, specifically found that the Disclosure Statement contained adequate information within the meaning of 11 U.S.C. § 1125.   In addition, this Court considered, and in the Disclosure Statement Order

approved, among other things, (a) all materials to be transmitted to creditors entitled to vote on the Joint Plan (collectively, the "Solicitation Materials"), including a notice of the hearing to approve confirmation of the Joint Plan and related matters; (b) the timing and method of delivery of the Solicitation Materials; and (c) the rules for tabulating votes to accept or reject the Joint Plan. The Debtors transmitted the Solicitation Materials in substantial compliance with the Disclosure Statement Order.

Except as otherwise provided or permitted by orders of this Court, the Debtors have otherwise complied with the applicable provisions of the Bankruptcy Code, and have therefore satisfied the requirements of 11 U.S.C. § 1129(a)(2).

C.    **Section 1129(a)(3) — The Joint Plan Has Been Proposed in Good Faith**

Section 1129(a)(3) of the Bankruptcy Code requires that the Joint Plan be "proposed in good faith and not by any means forbidden by law." Although not defined in the Bankruptcy Code, it has been held that good faith "is generally interpreted to mean that there exists a reasonable likelihood that the Joint Plan will achieve a result consistent with the objective and purposes of the Bankruptcy Code." In re Weber, 209 B.R. 793, 797 (Bankr. D. Mass. 1997). Courts have held that the good faith requirement of this section is satisfied when "the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success." Corestates Bank. N.A. v. United Chemical Tech. Inc., 202 B.R. 33, 57 (ED. Pa. 1996)(internal citations omitted); see also In re Piper Aircraft Corp., 244 F.3d 1289, 1300 (11th Cir. 2001) (§1129(a)(3) is satisfied when the plan is "proposed with the legitimate and honest purpose to reorganize").

The reorganization must be consistent with the objectives and purposes of the Bankruptcy Code. In re Sylmar Plaza. L.P., 314 F.3d 1070, 1074 (9th Cir. 2002) ("A plan

is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code.."); see also In re Weber, 209 B.R. at 797. In this regard, the Supreme Court has held that "[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984). Additionally, it has been held that "[a] plan is proposed in good faith if it bears some relation to the [Bankruptcy Code's] objective of resuscitating a financially troubled corporation." See Beal Bank, S.S.B. v. Waters Edge Ltd. Partnership, 248 B.R 668, 688 (D. Mass. 2000) (citing to In re Coastal Cable T.V.. Inc., 700 F.2d 762, 765 (1st Cir. 1983)).

Good faith for purposes of section 1129(a)(3) may also be found where the Joint Plan is supported by key creditor constituencies, or was the result of extensive arms-length negotiations with creditors. See In re The Leslie Fay Companies. Inc., 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) ("The fact that the plan is proposed by the committee as well as the debtors is strong evidence that the plan is proposed in good faith."); In re Eagle-Picher Indus. Inc., 203 B.R. 256, 274 (Bankr. S.D. Ohio 1996) (finding that plan of reorganization was proposed in good faith when, among other things, it was based on extensive arms-length negotiations among plan proponents and other parties in interest).

The Joint Plan has been proposed in good faith. The Debtors proposed the Joint Plan with the legitimate and good faith purpose of, among other things, (i) reorganizing the Debtors' businesses, (ii) the preserving and maximizing the Debtors' business enterprise value through reorganization under Chapter 11, (iii) restructuring the Debtors' finances, (iv) maximizing the recovery to creditors, (v) preserving jobs of the Debtors'

employees in connection with the Debtors' go-forward operations. See Plummer

Affidavit, at ¶18.    The Joint Plan was the product of arm's length negotiations among

the Debtor, Summit, and the Committee and is supported by Summit and the Committee.

The second prong of section 1129(a)(3) requires that the Joint Plan not contravene

any applicable non-bankruptcy law. See In re Keolbl, 751 F.2d 137, 139 (2d Cir. 1984).

The Debtors submit that the Joint Plan is consistent with applicable non-bankruptcy law.

In light of the foregoing, the Debtors have satisfied the requirements of 11 U.S.C.

§ 1129(a)(3).


**D.    Section 1129(a)(4) — All Payments to be Made by the Debtors in Connection With These Cases Are Subject to the Approval of the Court**

Section 1129(a)(4) of the Bankruptcy Code requires that all payments made by the

debtor or by a person issuing securities or acquiring property under the Joint Plan for

services or for costs and expenses incurred in connection with the case be approved by

the Court as reasonable.

As set forth in Article III of the Joint Plan, all Professional Fee Claims will be

subject to the Court's approval.   In addition, Article XII of the Joint Plan provides that

the Court will retain jurisdiction after the Effective Date to hear and determine all

applications for allowance of compensation or reimbursement of expenses by

Professional Fee Claim holders through the Effective Date.

Accordingly, the Joint Plan complies with the requirements of 11 U.S.C. §

1129(a)(4).

### E.    Section 1129(a)(5) — The Joint Plan Discloses All Required Information Regarding Postconfirmation Management and Insiders

Section 1129(a)(5) provides that the Joint Plan may be confirmed only if the Debtors disclose the identity of those individuals who will serve as management of the reorganized debtor and the nature of any compensation proposed to be paid to such insider. In addition, under section 1129(a)(5)(A)(ii), the appointment or continuation in office of management must be consistent with the interests of creditors, equity security holders, and public policy.

The Debtors have disclosed the identities and other relevant information regarding certain of the Reorganized Debtors' directors and officers. Article V, Section B, and the Plan Supplement identify the post-confirmation board of directors. Article V, Section F and the Plan Supplement identify the post-confirmation senior officers of the Reorganized Debtors and the terms of their compensation. Such appointments or the continuance of the individuals in such positions are consistent with the interests of the holders of Claims and Equity Interests and with public policy. Accordingly, the Joint Plan satisfies the requirements of 11 U.S.C. § 1129(a)(5).

### F.    Section 1129(a)(6) — The Joint Plan Does Not Provide for Any Rate Change Subject to Regulatory Approval

Section 1129(a)(6) requires that "[a]ny governmental regulatory commission with jurisdiction, after the confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." The Joint Plan complies with this section because the Joint Plan does not

provide for any change in rates over which a governmental regulatory commission has jurisdiction.

### G.  Section 1129(a)(7) — The Joint Plan is In the Best Interests of Creditors

Section 1129(a)(7) requires that, with respect to each impaired Class of Claims or Equity Interests, each holder of a Claim or Equity Interest of such Class (a) has accepted the Joint Plan or (b) will receive or retain property of a value not less than what such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  This provision is often referred to as a test of whether the Joint Plan is in the "best interests" of impaired creditors.

Under the Joint Plan, Nonpriority Unsecured creditors shall receive $425,000 upon the Effective Date and an additional $125,000 within one year of the Effective Date. The Debtors submitted a liquidation analysis with their Disclosure Statement (Exhibit C thereto).  The liquidation analysis estimates the recovery which would be realized upon a forced sale of the Debtors' assets and the extent to which funds would be available in a liquidation for payment to Nonpriority Unsecured Claims.   The liquidation analysis demonstrates that, in the event of a forced sale of all assets of the Debtors, no funds would remain to pay Nonpriority Unsecured Claims after payment of Secured, Administrative, and Priority Claims.  Virtually all assets of the Debtors are subject to the security interest of Summit.  Even if unencumbered funds became available through the pursuit of causes of action or otherwise, the Debtors would be required to pay more than $1,000,000 in Administrative and Priority Claims before any payment to Nonpriority Unsecured Claims could be made.  Because Class 6 Claim holders will receive more

under the Joint Plan than in a liquidation, the best interests test is satisfied as to such Class.

Class 7 Claims are properly subordinated to Nonpriority Unsecured Claims pursuant to the provisions of 11 U.S.C. §510. Accordingly, Class 7 Claims will recover nothing under the Joint Plan and would recover nothing in a liquidation. Because insufficient funds are available to pay Nonpriority Unsecured Claims in full either under the Joint Plan or in a liquidation, Equity Interest Classes (8 through 10) will recover nothing under either scenario. Consequently, the best interests test is satisfied as to Classes 7, 8, 9, and 10.

Accordingly, as set forth above and in the Plummer Affidavit, the Debtors have satisfied the "best interests" test of Section 1129(a)(7) because the distributions under the Joint Plan to dissenting creditors whose Claims are impaired are equal to or greater than the amount such creditors would recover in a chapter 7 liquidation of the Debtors. See Plummer Affidavit, at ¶22.

## H.    Section 1129(a)(8) — The Joint Plan Has Been Accepted By the Requisite Classes of Creditors and Interest Holders

Pursuant to 11 U.S.C. §1129(a)(8), unless the Joint Plan is to be confirmed pursuant to the "cram down" provisions of 11 U.S.C. § 1129(b), the Joint Plan must be accepted by all impaired Classes of Claims or Equity Interests. Class 7 and Class 8 are impaired under the Joint Plan and are deemed to have rejected the Joint Plan. Notwithstanding such rejection, the Debtors may proceed to confirmation of the Joint Plan pursuant to 11 U.S.C. §1129(b), provided that all other requirements of 11 U.S.C. §1129(a) are satisfied.

I.    **Section 1129(a)(9) – The Joint Plan Provides For the Payment of Priority Claims**

Section 1129(a)(9) requires that certain priority claims be paid in full on the Effective Date of the Joint Plan and that the holders of certain other Priority Claims receive deferred cash payments equal to the full amount of such Claim.

The Joint Plan satisfies these requirements. Article III of the Joint Plan provides that Allowed Administrative Claims, Professional Fee Claims, and Priority Claims will be paid in full in Cash on the later of the Effective Date or the date of allowance of such Claims.

J.    **Section 1129(a)(10) — The Joint Plan Has Been Accepted By at Least One Impaired, Non-Insider Class**

Section 1129(a)(l0) requires that the Joint Plan be accepted by at least one Class of Claims that is impaired under the Joint Plan, determined without including the acceptance of the plan by any insider. As set forth in the Report of Plan Voting, the Joint Plan has been accepted by Classes 1, 2, 3, 4, and 6.

K.    **Section 1129(a)(11) —The Joint Plan is Feasible**

Under Section 1129(a)(1 1), the Joint Plan may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(1 1).

Section 1129(a)(11), however, does not require a guarantee of the Joint Plan's success; rather, the proper standard is whether the Joint Plan offers a "reasonable

prospect" of success.  See In re Danny Thomas II Ltd. Partnership. 241 F.3d 959, 962 (8th Cir. 2002) ("While a reorganization plan's 'success need not be guaranteed,' the bankruptcy court cannot approve a plan unless it has at least a reasonable prospect for success.") (internal citations omitted); see also In re Belco Vending, 67 B.R. 234, 236-37 (Bankr. D. Mass. 1986) (referring to the feasibility requirements enunciated by the Court of Appeals for the Eighth Circuit that while the plan must offer a reasonable prospect of success, success need not be guaranteed (internal citations omitted)); see also Bridgeport Jai Alai. Inc. v. Autotote Systems, Inc., 215 B.R. 651, 653 (Bankr. D. Conn. 1997) (stating that success does not need to be "absolutely assured.").

Courts have identified a number of factors relevant to evaluating the feasibility of a proposed plan of reorganization, including (a) the prospective earnings or earning power of the debtor's business, (b) the soundness and adequacy of the capital structure and working capital for the debtor's post-confirmation business, (c) the debtor's ability to meet its capital expenditure requirements, (d) economic conditions, (e) the ability of management and the likelihood that current management will continue, and (f) any other material factors that would affect the successful implementation of the plan.  See e.g., In re Clarkson, 767 F.2d 417, 420 (8th Cir. 1985); In re WCI Cable. Inc., 282 B.R. 457, 486 (Bankr. D. Or. 2002); In re S&P. Inc.. 189 BR. 159, 168-69 (Bankr. N.D. Ind. 1995).

During the postpetition period, the Debtors have increased their cash position from approximately $450,000 to $2,100,000 and have otherwise preserved their assets and stabilized operations.  The Debtors have prepared projections of the Reorganized Debtors' balance sheets, statements of operations, and cash flows through the year ending December 31, 2006.  As set forth in the Plummer Affidavit, the projections indicate that

the Reorganized Debtors should have sufficient capitalization and profitability during the post-confirmation period to make the required payments under the Joint Plan and to continue operations.   In particular, the Debtors anticipate having at least $750,000 in working capital as of the Effective Date, which is a condition to Summit's support for Joint Plan confirmation.   Therefore, there is reasonable assurance that confirmation of the Joint Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors. See Plummer Affidavit, ¶26, 27.   Accordingly, the Debtors respectfully submit that the Plan satisfies the feasibility requirement of 11 U.S.C. § 1129(a)(11).

**L.  Section 1129(a)(12) — The Joint Plan Provides for the Payment of Fees**

Section 1129(a)(12) requires that, as a condition precedent to confirmation of the Joint Plan, "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." 11 U.S.C. § 1129(a)(12). Article III, Section A of the Joint Plan provides for payment of all fees arising under 11 U.S.C. § 1930 on or before the Effective Date, thereby satisfying this requirement.

**M.    Section 1129(b) — The Joint Plan Does Not Discriminate Unfairly and is Fair and Equitable**

Classes 7 (Stock Repurchase Claims) and 8 (MPC Equity Interests) are deemed to have rejected the Joint Plan because neither Class shall receive or retain any property under the Joint Plan on account of such Claims or Equity Interests. 11 U.S.C. §1126(g). Thus, the Joint Plan does not satisfy the requirement of section 1129(a)(8) that all impaired classes of claims and interests accept the plan.   The Joint Plan may still be

confirmed notwithstanding the failure to satisfy section 1129(a)(8) if the Joint Plan

satisfies the requirements of section 1129(b) (the so-called "cram-down" provisions) with

respect to the treatment of Classes 7 and 8. Section 1129(b) provides that a plan may be

confirmed so long as the plan "does not discriminate unfairly" and is "fair and equitable"

with respect to similarly situated classes of creditors.

The Bankruptcy Code does not define "unfair discrimination," leaving courts to

determine what might be "unfair" on a case-by-case basis. In re 203 N. LaSalle St. Ltd.

Partnership, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear

standard for determining the fairness of discrimination in the treatment of classes under a

Chapter 11 plan" and that "the limits of fairness in this context have not been

established"), rev'd on other grounds, 526 U.S. 434 (1999). Generally, however, the term

is interpreted to prohibit disparate treatment of creditors or interest holders under a

proposed plan unless there is a reasonable basis for doing so. See, e.g., 203 N. LaSalle St.

Ltd. Partnership, 190 B.R. at 585-86 ("[A]ny discrimination must be supported by a

legally acceptable rationale.").

No unfair discrimination exists under the Joint Plan as to Classes 7 and 8. The

Joint Plan does provide for the subordination of Class 7 (Stock Repurchase Claims) to the

Claims of Class 6 (Nonpriority Unsecured Claims). As discussed in greater detail in

Section IV herein, subordination of the Stock Repurchase Claims is appropriate under

existing law, as the legal characteristics of the Stock Repurchase Claims are

distinguishable from those of unsecured creditors. If this Court finds that subordination

of the Stock Repurchase Claims is not warranted, the Joint Plan provides that Class 7

claim holders shall participate in the distributions payable to Class 6 Claim holders. The

rights of Class 8 (MPC Equity Interests) are qualitatively different than the rights of secured and unsecured creditors and, accordingly, disparate treatment is appropriate for Class 8.

The related concept of "fair and equitable" is more clearly spelled out in the Bankruptcy Code than the concept of "unfair discrimination."

With respect to a class of unsecured claims, a plan is fair and equitable if the holders of claims or interests that are junior to such class do not receive or retain any property under the plan on account of such junior claim or interest, unless unsecured creditors are paid in full. 11 U.S.C. §1129(b)(2)(B)(ii). This provision is commonly referred to as the "absolute priority rule". See In re 203 North LaSalle Street Partnership, 126 F.3d 970 (7th Cir. 1997); Justice v. Carter, 972 F.2d 951, 954 (8th Cir. 1992).

The Equity Interests classified in Classes 8, 9, and 10 shall be extinguished under the Joint Plan. Summit or its designee shall acquire one hundred percent (100%) of the stock in the Reorganized MPC on account of its Unsecured Deficiency Claim, subject to dilution for management incentive options. The Reorganized MPC shall be the sole owner of the Reorganized HCC and Reorganized Aquamac. Because no Claims or Equity Interests junior to Class 7 shall receive or retain any property under the Joint Plan on account of such Claims or Equity Interests, the "fair and equitable" standard is satisfied as to Class 7.

The fair and equitable standard is similar as to Equity Interests. Section 1129(C)(ii) provides that a plan is fair and equitable as to a class of interests extinguished under the plan if the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

MPC has only one class of stock which shall be extinguished under the terms of the Joint Plan. Consequently, the Joint Plan is fair and equitable as to Class 8.

### N.    Section 1129(c) — Only One Plan is Being Confirmed

Section 1129(c) provides that a court may confirm only one plan. In the instant case, the Joint Plan is the only plan that has been proposed. Therefore this section is satisfied.

### O.    Section 1129(d) — The Principal Purpose of the Plan is not Tax Avoidance or Avoidance of Securities Laws

Section 1129(d) provides that a court may not confirm the Joint Plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933. As noted above, the Joint Plan has been proposed with the good faith intent to reorganize the operations of the Debtors and maximize recoveries to creditors. No party-in-interest that is a governmental unit has objected to confirmation of the Plan on the basis that the principal purpose of the Joint Plan is the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933. Accordingly, 11 U.S.C. § 1129(d) is satisfied.

## II.    THE ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE JOINT PLAN SHOULD BE APPROVED

The Joint Plan proposes that the Debtors will assume or reject certain executory contracts and unexpired leases.   Article VIII of the Joint Plan provides that executory contracts and unexpired leases shall be deemed rejected unless previously assumed by the Debtors, subject to a motion to assume pending as of the Confirmation Date, or otherwise assumed under the Joint Plan or the Plan Supplement.

Section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." Section 1123(b)(2) permits a plan to "provide for the assumption, rejection or assignment of any executory contract or unexpired lease of the debtor not previously rejected." The Debtors' decision to reject any executory contract or unexpired lease is subject to the business judgment test. In re Bankvest Capital Corp., 290 BR. 443 (B.A.P. 1st Cir. 2003).

Courts generally will not second-guess a debtor's business judgment concerning the assumption or rejection of an executory contract or unexpired lease. See Phar-Mor. Inc. v. Stross Bldg., 204 B.R. 948, 951-52 (Bankr. N.D. Ohio 1997) ("Whether an executory contract is 'favorable' or 'unfavorable' is left to the sound business judgment of the debtor.. .. Courts should generally defer to a debtor's decision whether to reject an executory contract."). The "business judgment" test is not a strict standard; it merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate. See Allied Technology. Inc. v. RB. Brunemann & Sons. Inc., 25 B.R. 484, 495 (Bankr. S.D. Ohio 1982). Because the Debtors have made the determination in their sound business judgment as to which executory contracts and unexpired leases to assume or reject as of the Effective Date, the assumption or rejection of such executory contracts and unexpired leases pursuant to the Joint Plan should be approved.

## III.   SUBSTANTIVE CONSOLIDATION OF THE DEBTORS FOR DISTRIBUTION PURPOSES ONLY IS APPROPRIATE

The Joint Plan provides for substantive consolidation of the Debtors for distribution purposes. Such consolidation is necessary and appropriate as the Debtors

have been operated historically as a single integrated enterprise. The affairs of the

Debtors are sufficiently intertwined that disentanglement would be extremely difficult

and could result in arbitrary and otherwise unfair results to creditors. Moreover, efforts

to segregate the Debtors would be costly and time-consuming and would outweigh any

benefits to be derived therefrom.

Substantive consolidation of the Debtors is warranted for several reasons:

(i)    <u>Common Officers and Directors:</u>   The Debtors share common officers and directors. Donald R. Plummer is the president and treasurer of each of the Debtors. Daniel J. Mirski serves as chief financial officer. Mr. Plummer and John T. Leahy are directors for each of the Debtors;

(ii)   <u>Consolidated Financial Reporting:</u>   The Debtors prepare consolidated financial statements and consolidated tax returns;

(iii)  <u>Single Credit Facility:</u>   Prior to the Petition Date, the Debtors utilized a single revolving credit facility with Fleet, and later Summit. Each of the subsidiaries guaranteed the entire MPC indebtedness to Summit and granted liens upon substantially all of their assets to secure such guarantees. Advances were made based upon a single borrowing base certificate. Such advances were forwarded to a single account maintained by MPC; disbursements were then made by MPC to other Debtors as necessary to fund operations. MPC carried the entire loan indebtedness on its financial statements only. Loan advances and repayments among the Debtors were accounted for through extensive use of intercompany entries;

(iv)   <u>Single Payment of Salaried Personnel:</u>   Certain salaried persons were employed by MPC, and such employees were paid by MPC even though such persons provided services for HCC and Aquamac as well. The benefits derived by the subsidiaries from such services were also adjusted through the intercompany accounting mechanism;

(v)    <u>Use of Leased Property:</u>   In certain instances, HCC may also have been given use of leased property which was recorded on the books and records of MPC.

The Bankruptcy Code does not provide explicit statutory authority for substantive consolidation; rather, Courts have relied upon the broad grant of power codified in Section 105(a) of the Bankruptcy Code which provides: "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." In re Hemingway Transport, Inc. et al, 954 F.2d 1, 11, n.14 (1st Cir. 1992). Courts have noted a trend toward allowing substantive consolidation, which has its genesis in the increased judicial recognition of the widespread use of inter-related corporate structures. Eastgroup Properties v. Southern Motel Assoc., Ltd., 935 F.2d 245, 248-49 (11th Cir. 1991).

In determining whether substantive consolidation is appropriate, the First Circuit has held that the movant must demonstrate that the debtors "assets and liabilities are so intertwined that it would be impossible or financially prohibitive, to disentangle their affairs." Hemingway, 954 F.2d at 11, n.15. Many courts have relied upon the seven-factor test articulated in In re Vecco Construction Industries, Inc., 4 B.R. 407 (Bankr. E.D. Va. 1980) in determining whether substantive consolidation is warranted. Such factors include:

    (i)       the presence or absence of consolidated financial statements;

    (ii)      the unity of interest and ownership between the various corporate entities;

    (iii)     the existence of parent and intercorporate guarantees on loans;

    (iv)    the degree of difficulty in segregating and ascertaining individual assets and liabilities;

    (v)      the transfer of assets without formal observance of corporate formalities;

    (vi)     the commingling of assets and business functions; and

(vii)    the profitability of consolidation at a single physical location.

See also In re Mortgage Investment Co., 111 B.R. 604, 610 (Bankr. W.D. Tex. 1990).

Consolidation is appropriate based upon the foregoing factors.  The Debtors share common ownership and are part of a controlled group.  The Debtors utilize consolidated financial reporting and file consolidated tax returns.  Each of the Debtors is liable for the entire outstanding indebtedness of $19,000,000 to Summit.  Because of the historic usage of a single integrated credit facility, the Debtors are unable to ascertain with certainty the assets and liabilities for each Debtor without a great deal of forensic accounting. Moreover, the Debtors may have engaged in limited asset transfers without a complete accounting for same.  Based upon the totality of the circumstances, substantive consolidation is warranted and in the best interests of creditors.

No parties in interest have objected to confirmation of the Joint Plan on account of the substantive consolidation of the estates.  The only unresolved objections to confirmation are those of the Stock Repurchase Claims (as discussed in greater detail in Section IV below).  The Stock Repurchase Claim holders will not be adversely impacted by substantive consolidation.  In fact, holders of Stock Repurchase Claims, whose Claims are against MPC, may benefit from the cause of action associated with the HCC acquisition.

## IV.    THE OBJECTIONS TO THE JOINT PLAN HAVE EITHER BEEN RESOLVED BY AGREEMENT OR ARE WITHOUT MERIT AND SHOULD BE OVERRULED

Six objections (collectively, the "Objections") were filed to confirmation, as follows:

(i)      Objection of the Pension Benefit Guaranty Corporation ("PBGC") to
Debtors' Proposed Joint Plan of Reorganization ("PBGC Objection");

(ii)     Limited objection to confirmation of the Debtor's Plan of Reorganization
by the Commonwealth of Massachusetts Commissioner of Revenue (the "DOR
Objection;)

(iii)    Objection by Claimant Mary K. Logan to Joint Reorganization Plan of
Debtors ("Logan Objection");

(iv)     Objection of Creditors Ralph Harrison and Alan R. Eggert to First
Amended Joint Reorganization Plan of Merrimac Paper Company, Inc., Holyoke Card
Company, Inc., and Aquamac Corporation ("Harrison/Eggert Objection");

(v)      Objection by Creditor William L. Provost, Jr. to Confirmation of First
Amended Joint Reorganization Plan of Merrimac Paper Company, Inc., Holyoke Card
Company, Inc., and Aquamac Corporation (the "Provost Objection"); and

(vi)     Sharon Ternullo's objection to the Confirmation of the Joint Plan (the
"Ternullo Objection" and, together with the Logan Objection, Harrison/Eggert Objection,
and Provost Objection, the "ESOP Objections").

Each of the objections and the disposition thereof are addressed below.

## A.    The PBGC Objection

The principle objection of the PBGC to the Joint Plan was that confirmation would
result in the distress termination of the defined benefit pension plan of Pepperell Paper
Company, Inc. ("PPC"), a non-debtor affiliate.  As part of the settlement among the
Debtors, the Committee, and Summit respecting the Committee's objections to
confirmation, the request for distress termination of the PPC pension plan is being

withdrawn pursuant to the Modifications.  The Debtors have also modified the Joint Plan to clarify the continuing obligations of the Debtors under existing employee benefit plans subject to ERISA.  Based upon such Modifications, the PBGC has agreed to withdraw its objection.

### B.    The DOR Objection

The Joint Plan originally provided for an injunction against governmental authorities from pursuing collection of the Debtor's tax obligations as against responsible persons until all payments had been made under the Joint Plan.  The DOR objected to the injunction as being in contravention of its enforcement rights against non-debtor parties. The Joint Plan has been modified by removing the injunction provisions and inserting a provision requiring the taxing authorities to apply any Joint Plan payments first to the trust fund portion of any tax obligation.  Based upon the foregoing, the DOR has agreed to withdraw its objection.

### C.    The ESOP Objections

The ESOP Objections all raise substantially the same issue.   Prior to the Petition Date, several former ESOP participants received stock repurchase notes from MPC upon separating from service and exercising their option to "put" their MPC stock back to the company.  The stock repurchase notes went largely unsatisfied, and the former ESOP participants have asserted claims against MPC on account of such notes.

The Debtors have asserted that the Stock Repurchase Claims are properly subordinated under Sections 510(b) and 510(c) of the Bankruptcy Code, and the Joint Plan separately classifies and subordinates such claims.  MPC and Messrs. Harrison and Eggert are parties to an adversary proceeding in which MPC has requested, among other

TRA 1521530v4                                     29

relief, subordination of the Harrison and Eggert Stock Repurchase Claims. MPC has filed a motion for summary judgment and supporting memorandum in that action, scheduled for hearing contemporaneously with confirmation. The basis for subordination as articulated in the summary judgment pleadings is applicable to all of the ESOP-related claims. The Debtors incorporate such pleadings herein by reference. A copy of the memorandum in support of the motion for summary judgment is attached as Exhibit A for the Court's convenience.

In summary, the Debtors have alleged that the claims of the former ESOP participants constitute claims for damages arising from the purchase or sale of a security, and that Section 510(b) compels the subordination of such claims. Alternatively, the Debtors allege that the Stock Repurchase Claims are properly subordinated under Section 510(c) based upon a substantial body of case law holding that claims arising from stock redemptions must be subordinated, as the genesis of the claim is in equity and that it would be inequitable for such claims to share equally in the distribution of estate assets with "true" creditors.

### D.    Best Interests Test

One of the ESOP objectors, Sharon Ternullo, a creditor of MPC, also alleged that the Joint Plan fails to satisfy the best interests of creditors test articulated in 11 U.S.C. §1129(a)(7). Specifically, Ternullo alleges that all creditors of MPC should be paid in full prior to any distribution to Summit because of potential claims against Summit arising out of the HCC acquisition, described in greater detail in Section III above. This objection is without merit.

First, to the extent that any claims exist against Summit on account of the HCC acquisition, such claims would inure only to the benefit of creditors of HCC. Creditors of MPC, including the Stock Repurchase Claim holders, would have no standing to assert such claims, even if the Stock Repurchase Claims were not subordinated as provided under the Joint Plan.

Second, HCC received consideration in connection with the prior acquisition, and there can be no serious challenge to the validity of Summit's lien. Even if HCC did not receive fair value for its guarantee of MPC's outstanding $23,000,000 indebtedness to Summit, the guarantee would likely be enforceable at least to the extent of the value of assets acquired of $7,500,000 which, in any event, would eliminate any recovery for unsecured creditors of HCC.

Moreover, the costs and delays associated with further litigating the HCC acquisition would substantially diminish any potential recovery.

Lastly, the Committee has actively represented the interests of Nonpriority Unsecured Claim holders in connection with potential causes of action against Summit. The Committee vigorously pursued litigation of such claims over a period of several weeks and agreed to a resolution which it deemed to be fair consideration for the claims pursued.

## CONCLUSION

For the reasons, and based on the authorities and evidence presented above, and as will be further demonstrated at the Confirmation Hearing, the Debtors submit that the Joint Plan satisfies all of the applicable requirements of the Bankruptcy Code and the Bankruptcy Rules and should be confirmed. Accordingly, the Debtors respectfully

TRA 1521530v4                                      31

request that the Court enter an order (a) confirming the Joint Plan, and (b) granting the

Debtors such other and further relief as is just and appropriate.

> Merrimac Paper Company, Inc.,
>
> Holyoke Card Company, Inc.,
> Aquamac Corporation,
>
> By counsel:
>
>
> /s/ Jesse I. Redlener
> Harold B. Murphy (BBO # 362610)
> Andrew G. Lizotte (BBO 559609)
> Jesse I. Redlener BBO #646851
> HANIFY & KING
> Professional Corporation
> One Beacon Street
> Boston, MA 02108
> (617) 423-0400

November 3, 2003
389526