# EXHIBIT A



UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| MERRIMAC PAPER COMPANY, INC., ) | Chapter 11 |
| *et al.* ) | Case No. 03-41477-JBR to |
| ) | 03-41479-JBR |
| Debtors ) | |
| ) | Jointly Administered |
| MERRIMAC PAPER COMPANY, INC., ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| V. ) | |
| ) | |
| RALPH HARRISON, ) | |
| ALAN EGGERT, ) | Adv. Proc. No. 03-04181 |
| ) | |
| Defendants ) | |
| ) | |
| ) | |

FILED IN CLERK'S OFFICE
2003 OCT 15 A 10:49
BANKRUPTCY COURT
WORCESTER, MA.

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

To the Honorable Joel B. Rosenthal, United States Bankruptcy Judge:

Merrimac Paper Company, Inc., the plaintiff herein ("MPC"), respectfully files this memorandum in support of the *Plaintiff's Motion For Partial Summary Judgment (the "Motion")* against defendants Ralph Harrison ("Harrison") and Alan Eggert ("Eggert") (collectively, the "Defendants").

### I.    OVERVIEW OF THE REQUESTED RELIEF

In this adversary proceeding, MPC has requested the following relief:

(i)        Count I-equitable subordination of the claims that may be asserted by the Defendants pursuant to the provisions of 11 U.S.C. §510(c);

(ii)        Count II- avoidance of MPC's obligations to the Defendants under certain stock repurchase notes as fraudulent transfers pursuant to the provisions of 11 U.S.C. § 544 and M.G.L. ch. 109A;

(iii)      Count III- transfer of the attachments obtained by the Defendants to MPC, pursuant to 11 U.S.C. § 510(c)(2), as the attachments secure obligations subject to subordination;

(iv)      Count IV- avoidance of the attachment obtained by Eggert as preferential pursuant to 11 U.S.C. § 547;

(v)       Count V- avoidance and recovery of $543,203.00 paid to Harrison on account of his stock interest in MPC as fraudulent transfers pursuant to the provisions of 11 U.S.C. § 544 and M.G.L. ch. 109A; and

(vi)      Count VI- subordination of the claims asserted by the Defendants pursuant to the provisions of 11 U.S.C. § 510(b).

Pursuant to the Motion, MPC moves for summary judgment as to Counts I, III, IV, and VI.

## II.   SUMMARY OF UNDISPUTED FACTS[1]

1.     MPC is a Delaware corporation with a principal place of business at 9 South Canal Street, Lawrence, Massachusetts. Statement of Undisputed Facts, ¶1.

2.     MPC and its wholly-owned subsidiaries, Holyoke Card Company, Inc. and Aquamac Corporation, commenced these jointly administered cases by filing voluntary Chapter 11 bankruptcy petitions on March 17, 2003 (the "Petition Date"). Statement of Undisputed Facts, ¶2.

3.     The Debtors continue to operate as debtors-in-possession pursuant to 11 U.S.C. §§ 1107, 1108. Statement of Undisputed Facts, ¶3. On or about March 26, 2003, the Office of

---

[1] Simultaneously herewith, MPC has filed a Statement of Undisputed Facts in support of its motion for partial summary judgment. For the Court's convenience, a brief narrative summary of facts is provided.

the United States Trustee formed the Official Committee of Unsecured Creditors. Statement of Undisputed Facts, ¶3.

4.    Since 1985, MPC has maintained an ESOP for the benefit of present and former employees. See Exhibit B to this memorandum attached hereto, at ¶4; Exhibit C to memorandum, Tab 1.   The ESOP provides that, upon separation from service, participants are entitled to a distribution of MPC stock allocable to them based upon participation in the ESOP. Exh. C, Tab 1, §§ 10.01, 10.02.

5.    Within fifteen (15) months of the date of a stock distribution, ESOP participants have the right to sell, or "put", the MPC shares distributed to them back to the ESOP or to MPC. Exh. C, Tab 1, § 10.04.   The Defendants were vested participants in the ESOP and exercised the put options. Statement of Undisputed Facts, ¶7.

### A. Harrison's Claims

6.    Harrison was employed by MPC from 1963 to 1999. Statement of Undisputed Facts, ¶8. Harrison separated from service as a human resources manager in 1999. Statement of Undisputed Facts, ¶9.

7.    At the time of separation from service, Harrison owned approximately six percent (6%) of the outstanding common stock of MPC through participation in the ESOP. Exh. B, ¶10.

8.    Upon Harrison's separation from service, the ESOP conducted a valuation of Harrison's interest in MPC, which value was determined to be $1,116,200 as of December 31, 1999. Statement of Undisputed Facts, ¶11.

9.    On or about January 1, 2000, Harrison was paid the sum of $200,000.00 by MPC in partial satisfaction of the stock redemption price of $1,116,200.00. Statement of Undisputed Facts, ¶12.

10.    MPC redeemed the balance of the stock in exchange for a note in favor of

3

Harrison dated July 19, 2000 in the original principal amount of $916,300, with interest accruing at the rate of eight and one-half percent (8.5%) per annum, payable in three annual installments (the "Harrison Note"). Statement of Undisputed Facts, ¶13.

11.     Harrison accepted delivery of the Harrison Note in exchange for the stock. Statement of Undisputed Facts, ¶13.

12.     On January 4, 2001, MPC paid Harrison the sum of $343,203.00 as the first installment payment under the Harrison Note. Statement of Undisputed Facts, ¶14. No further payments were made on the Harrison Note. Statement of Undisputed Facts, ¶15.

13.     On September 6, 2002, Harrison commenced a civil action in the Commonwealth of Massachusetts, Essex Superior Court against MPC for nonpayment of the Harrison Note. Statement of Undisputed Facts, ¶16. On September 12, 2002, the Essex Superior Court granted an attachment in favor of Harrison and against MPC in the amount of $610,000 (the "Harrison Attachment."). Statement of Undisputed Facts, ¶17.

14.     On or about July 31, 2003, Harrison filed a proof of claim with this Court asserting a secured claim in the amount of $733,367.00 and an unsecured claim in the amount of $15,000.12. Statement of Undisputed Facts, ¶18.


## B. Eggert's Claims

15.     Eggert was employed by MPC from 1975 to 2000, separating from service in year 2000 as technical director and executive vice-president. Statement of Undisputed Facts, ¶19.

16.     At the time of separation from service, Eggert owned 962 shares of MPC stock, or approximately nine percent (9%) of the outstanding shares.   Exh. B, ¶9. Of this amount, 850 shares were owned through Eggert's participation in the ESOP. Exh. B, ¶9.

17.     Upon Eggert's separation from service, the ESOP conducted a valuation of

4

Eggert's vested stock rights in the ESOP, which value was determined to be $1,555,500 as of December 31, 1999. Statement of Undisputed Facts, ¶21.

18.     MPC redeemed the stock in exchange for a note in favor of Eggert dated December 29, 2000 in the original principal amount of $1,555,500, with interest accruing at the rate of eight and one-half percent (8.5%) per annum, payable in three annual installments (the "Eggert Note" and together with the Harrison Note, the "Stock Redemption Notes") on account of Eggert's ESOP claim. Statement of Undisputed Facts, ¶22.

19.     Eggert accepted delivery of the Eggert Note in exchange for the stock.  Statement of Undisputed Facts, ¶23.

20.     No payments were made on account of the Eggert Note.  Statement of Undisputed Facts, ¶24.

21.     On January 8, 2003, the Defendants commenced a civil action in the United States District Court for the District of Massachusetts (the "District Court") against MPC, among others, demanding payment of monies owing under the Stock Redemption Notes. Statement of Undisputed Facts, ¶25.  On or about January 29, 2003, the District Court issued an attachment in favor of Eggert and against MPC in the amount of $1,829,935 (the "Eggert Attachment"). Statement of Undisputed Facts, ¶26.

22.     On April 3, 2003, Eggert filed a proof of claim with the Court asserting a secured claim in the amount of $1,555,500.00.  Statement of Undisputed Facts, ¶27  (The proofs of claim filed by Harrison and Eggert are hereinafter referred to as the "Claims").

III.  **SUMMARY OF ARGUMENT**

A.  **Summary Judgment Standards**

A party is entitled to summary judgment upon a showing that there is no genuine issue of material fact and that, on the uncontroverted facts, the movant is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  Where the burden of proof at trial would fall on the party seeking summary judgment, that party must support its motion with evidence--in the form of affidavits, admissions, depositions, answers to interrogatories, and the like--as to each essential element of cause of action.  The evidence must be such as would permit the movant at trial to withstand a motion for directed verdict under Federal Rule of Civil Procedure 50(a).  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); In re Molten Metal Technology, Inc., 262 B.R. 172, 175 (Bankr.D.Mass. 2001).

Where the moving party would not bear the burden of proof at trial, the movant's initial burden is to demonstrate or point out a lack of evidence to support at least one essential element of the opposing party's case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986).  The burden then shifts to the opposing party to adduce such evidence on each of the disputed elements as at trial would be sufficient to withstand a motion for directed verdict.  See Anderson v. Liberty Lobby, Inc., supra.

MPC bears the burden of proof as to (i) the subordination of the claims of the Defendants under Sections 510(c) and 510(b) of the Bankruptcy Code; (ii) the avoidance of the Defendant's liens under Section 510(c)(2) of the Bankruptcy Code; and (iv) the avoidance of the Eggert Attachment as a preferential transfer under Section 547 of the Bankruptcy Code.  Harrison and Eggert bear their respective burdens as to their affirmative defenses with respect to each.  See 11 U.S.C. §§ 510(c), and 547.

**B. The Evidence Conclusively Establishes that MPC is Entitled to Judgment as a Matter of Law respecting Subordination of the Stock Redemption Claims of Harrison and Eggert**

There is no genuine issue of material fact as to any element of MPC's case in chief concerning the subordination of the Claims under Sections 510(c) and 510(b) of the Bankruptcy Code. The Claims should be subordinated under Section 510(c) because of their origin as stock redemption debt, without any need for a showing of wrongdoing on the part of the claimants. The Claims also constitute a claim for damages arising from the purchase and sale of securities, satisfying the subordination criteria of Section 510(b).

**1. The Claims of the Defendants are properly subordinated to the claims of unsecured creditors pursuant to 11 U.S.C. §510(c), regardless of the existence of wrongdoing**

Section 510(c) of the Bankruptcy Code provides for subordination of stock redemption claims to the claims of nonpriority unsecured creditors, without any finding of wrongdoing by the claimant. Section 510(c) provides as follows:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may-

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest...

Numerous decisions, including four in this district, have held that debt claims originating from equity interests should be subordinated under Section 510(c) to claims of unsecured creditors, irrespective of the existence of inequitable conduct. Liebowitz v. Columbia Packing Co., 56 B.R. 222 (D. Mass. 1985); In re Main Street Brewing Co., Ltd., 210 B.R. 662 (Bankr. D. Mass. 1997); In re New Era Packaging, 186 B.R. 329 (Bankr. D. Mass. 1995); In re SPM Manufacturing Corp., 163 B.R. 411 (Bankr. D. Mass. 1994) (collectively, the "Massachusetts Decisions"). As articulated by the District Court of Massachusetts in Liebowitz:

> When a stockholder sells his stock to a corporation and receives cash and a promissory note from the corporation in return, that stockholder does not thereby become a debt creditor who stands on equal footing with trade or general creditors should the corporation become bankrupt. [citation omitted]. The underlying nature of the transaction survives, and the note remains an equity obligation. A stockholder who accepts a note in payment for his stock assumes the risk that the corporation will be solvent when the note becomes due. Id. at 224.

In Liebowitz, the District Court of Massachusetts held that it was immaterial whether the corporation was solvent when the stock was redeemed or that the agreement had been reached in good faith. Id. at 224. The determining fact is whether the debtor has a sufficient surplus to retire the stock at the time payment is to be made. Id.

SPM, which relied in part upon the Liebowitz holding, has been described as the leading case in this district respecting the impact of 11 U.S.C. § 510(c) on stock redemption claims. See New Era Packaging, 186 B.R. at 336. In describing the policy rationale for subordination, the SPM court held that:

> Subordination of redemption debt raises policy considerations which are similar to those present in the subordination of damage claims arising from the purchase or sale of the debtor's stock, such as a claim for violation of the securities laws in issuance of the stock... only shareholders should bear the risk of fraud or other illegality in the issuance of shares. Assigning the risk to shareholders is justified on the ground that only shareholders have the ability to participate in profits. Subordination of claims arising from purchase or sale of the debtor's stock is likened to subordination of stock to debt under the absolute priority rule.

> Much the same considerations justify subordination of redemption debt. Indeed, there is more reason for subordination of redemption debt than subordination of damage claims arising from stock purchase. A stock purchase claimant is attempting to recover only the cost of his investment, where a stock redemption claimant is usually seeking profit in the sale of the stock. A redemption claimant, moreover, is trying to recover what is essentially a liquidating dividend on his stock. 163 B.R. at 415, 416.

The majority of courts outside this district have concurred with the Massachusetts Decisions that subordination of stock redemption claims under Section 510(c) is appropriate regardless of the existence of inequitable conduct. See In re Envirodyne Industries, Inc., 176

8

B.R. 825, 834 (Bankr. N.D. Ill.1995)(in subordinating the debt claims of former shareholders, the court held: "the Defendants, although legally creditors, are in essence former equity holders...the Defendants never lent money to the corporation nor do they share any other characteristic of an ordinary creditor."); In re Dino & Artie's Automatic Transmission Co., Inc., 68 B.R. 264 (Bankr. S.D.N.Y. 1986)(avoidance of mortgage lien and equitable subordination of underlying claim arising out of insolvent corporation's stock repurchase obligation); In re Micro-Acoustics Corp., 34. B.R. 279, 282 (Bankr. S.D.N.Y. 1983)(in allowing for plan subordination of a stock repurchase claim, court viewed "with suspicion the temptation on the part of stockholders to lay aside their garb as equity holders and to assume the role of creditors."); In re Hawaii Corp., 694 F.2d 179, 181 (9th Cir. 1982)(stock repurchase claims subordinated to unsecured creditors; "when debt securities are issued in exchange for a company's own stock, it is necessary to a recovery that the corporation should be solvent and have sufficient surplus to prevent injury to creditors when the payment is actually made.").

The above findings are consistent with decisions entered under the prior Bankruptcy Act. Matthews Bros. V. Pullen, 268 F. 827 (1st Cir. 1920); Robinson v. Wangeman, 75 F.2d 756 (5th Cir. 1935). In Matthews, the shareholder sold her shares in the debtor corporation for cash and a promissory note at a time when the debtor was solvent. The note was subsequently transferred to a third party who sought to participate pari passu with unsecured creditors in a distribution of the assets of the insolvent entity. The First Circuit concluded that the stockholder's claim was properly subordinated to the claims of creditors. Similarly, in Robinson, the Fifth Circuit Court of Appeals held that a stock redemption claim of the debtor's president was subordinated to the claims of creditors, despite the fact that the debtor was solvent at the time of issuance of the note. The Fifth Circuit concluded that the corporation received nothing of value from the transfer, and that stockholders, including stock repurchase claimants, are not entitled to receive any part of the

9

assets of a corporation until creditors are paid in full. Id. at 757-58.

The Claimants are anticipated to argue that per se equitable subordination of stock redemption claims is inappropriate, relying upon: United States v. Noland, 517 U.S. 535, 116 S. Ct. 1524 (1996); In re Stoecker, 179 F.3d 546 (7th Cir. 1999); Raleigh v. Ill. Dept. of Revenue, 530 U.S. 15, 120 S. Ct. 1951 (2000); In re Lifschultz Fast Freight, 132 F.3d 339 (7th Cir. 1997); Burden v. United States, 917 F.2d 115 (3rd Cir. 1990); and Moyer v. Official Committee of Unsecured Creditors of Paint and Assembly Corporation, 2001 WL 290384 (S.D. Ind. 2001).[2] A review of the foregoing cases indicates that four of the decisions (Noland, Raleigh, Stoecker, and Burden) involve subordination of late filed tax claims or tax penalty claims and are therefore plainly inapplicable. Lifschultz involved subordination of an insider secured claim unrelated to stock redemption and is also inapplicable. The remaining decision (Moyer) involved subordination of stock redemption claims, but was clearly wrongly decided for the reasons set forth infra. None of the authorities therefore support the allowance of the Claims pari passu with the claims of unsecured creditors.

In Noland, the United States Supreme Court held that postpetition, noncompensatory tax penalty claims could not be equitably subordinated on a categorical basis. To do so would be in derogation of the priority scheme of the Bankruptcy Code. The Burden case involved an attempt by the debtor to subordinate prepetition tax penalty claims. The Third Circuit concluded that all relevant facts and circumstances had to be explored prior to authorizing subordination of the claims. 917 F.2d at 120. Both Stoecker and Raleigh involved subordination of late filed tax claims. See In re Stoecker, 179 F.3d 546 (7th Cir. 1999)(late filed claim not equitably subordinated on grounds of inexcusable delay; equitable subordination must be exercised on case

---

[2] See motion by Ralph Harrison and Alan Eggert to convert case to Chapter 7, filed on or about August 29, 2003.

10

by case basis); <u>Raleigh v. Illinois Dept. of Revenue</u>, 530 U.S. 15, 120 S. Ct. 1951 (subordination of late filed tax claim limited by provisions of the Bankruptcy Code).

<u>Lifschultz</u>, did not address issues respecting subordination of stock redemption claims. Rather, <u>Lifschultz</u> was premised upon efforts by a chapter 7 trustee to equitably subordinate a secured claim asserted by an insider based upon a prior loan.

The <u>Moyer</u> decision, which held against <u>per se</u> equitable subordination of all stock redemption claims, is plainly wrong. <u>Moyer</u> relied in part upon the <u>Noland</u> decision in reaching its determination. <u>Id.</u> at 793. The reliance by the <u>Moyer</u> court upon <u>Noland</u>, however, is misplaced. A review of the reasoning underlying <u>Noland</u> demonstrates support for the continuing viability of the <u>per se</u> subordination of stock redemption claims. <u>See Main Street Brewing</u>, <i>infra</i>. In addressing the impact of <u>Noland</u> upon the <u>per se</u> subordination of stock redemption claims, <u>Main Street Brewing</u> held that the <u>Noland</u> decision supported, rather than undermined, equitable subordination of stock redemption claims. Unlike the subordination of tax penalty claims, the <u>per se</u> subordination of stock redemption claims does not conflict with the general priority scheme of the Bankruptcy Code. Stock redemption claims are subordinated because they would otherwise constitute a stock interest; granting such claims parity with other unsecured claims would, in fact, run counter to the priority of debt over equity in bankruptcy. 210 B.R. at 666. The <u>Main Street Brewing</u> court also found that, unlike the subordination of tax claims, substantial pre-Code cases exist supporting the subordination of stock redemption claims. <u>Id.</u> at 666.[3]

The <u>per se</u> subordination of the Stock Redemption Notes is consistent with the statutory priorities established by the Bankruptcy Code. Under that priority framework, equity recovers

---

[3] Holdings similar to <u>Moyer</u> were reached in <u>In re Stem-Slegman-Prins Co.</u>, 86 B.R. 994 (Bankr. W.D. Mo. 1988) and <u>In re Montgomery Ward Holding Corp.</u>, 272 B.R. 836 (Bankr. D. Del. 2001). For the same reasons set forth as to <u>Moyer</u>, such decisions are plainly wrong.

only after nonpriority unsecured creditors are paid in full. The rationale behind the priority scheme is that equity knowingly assumes the risk of nonpayment in exchange for the benefit of sharing in the profits and opportunities in the company beyond the initial investment. Nonpriority unsecured creditors do not share in this upside. See In re Betacom of Phoenix, Inc., 240 F.3d 823, 830 (9th Cir. 2001). This accepted order of priority should not be altered merely because equity has converted its interest into a note. The conversion to a note does not change the basic nature of the obligation.

Fairness dictates the subordination of the Stock Redemption Notes. The Plan provides for an anticipated distribution to nonpriority unsecured creditors of approximately ten percent (10%) of allowed claims. In a liquidation, the recovery for unsecured creditors would be less, and likely nothing. In either case, shareholders will receive nothing on account of their equity interests. The Stock Redemption Notes undisputably arise from MPC's redemption of the Defendants' stock interest in MPC. The Claims should therefore be subordinated as a matter of law. MPC has satisfied the necessary elements for equitable subordination pursuant to 11 U.S.C. § 510(c).

2.      **The Claims of the Defendants are also properly subordinated pursuant to the provisions of Section 510(b).**

Section 510(b) of the Bankruptcy Code provides for mandatory subordination of claims upon satisfaction of the statute's criteria. Section 510(b) provides in pertinent part:

> For the purposes of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, *for damages arising from the purchase or sale of such a security*, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interest that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock (emphasis added).

If this Court finds that the Claims constitute claims for damages arising out of the

12

purchase or sale of a security of MPC, Section 510(b) mandates that the Claims be subordinated to those of all creditors.

### i. Section 510(b) Does Not Require the Existence of Securities Fraud

Section 510(b) provides for the mandatory subordination of any contractual or tort claims relating to the purchase or sale of securities of the debtor, not merely those claims arising from securities fraud. See, e.g., In re Betacom of Phoenix, Inc., 240 F.3d 823 (9th Cir. 2001)(appeals court subordinated shareholder claims for breach of contract, fraud, and breach of fiduciary duty after a merger agreement failed to close, finding subordination was appropriate for claims sounding in contract as well as tort).

In reaching its conclusions, the Betacom court examined the reasoning behind Section 510(b).   Creditors and investors have differing expectations in their relationships with the debtor. Creditors may only recoup their debt, while investors expect to participate in the firm's profits and recover more than their initial investment in the debtor.   Additionally, creditors may rely upon the funds contributed by equity holders and the related equity cushion in assessing the risk of providing credit to the debtor. Betacom, 240 F.3d at 830.

Other courts have reached similar findings respecting the breadth of Section 510(b)'s applicability. See In re Telegroup, Inc., 281 F.3d 133 (3rd Cir. 2002)(claim for breach of contractual provision in a stock purchase agreement requiring the issuer to use best efforts to register stock and ensure the stock's free tradability arises from the purchase of the stock and must be subordinated); In re NAL Financial Group, Inc., 237 B.R. 225 (Bankr. S.D. Fla. 1999)(claim by purchaser of debentures for breach of contractual provision to use best efforts to register debentures was properly subordinated under Section 510(b)); In re Granite Partners, L.P., 208 B.R. 332, 337 (Bankr. S.D.N.Y. 1997)(cautioning against an overly restrictive interpretation of Section 510(b); Congress concerned with larger issue of investor's claim against

the issuer based upon the loss of investment, rather than just securities fraud); In re Vista

Eyecare, Inc., 283 B.R. 613 (Bankr. N.D. Ga. 2002)(contractual claim for failure to honor "put"

obligation for stock in connection with a prior acquisition was properly subordinated under

510(b)); In re Lenco, 116 B.R. 141 (Bankr. E.D. Mo. 1990)(section 510(b) required

subordination of claims relating to overpayment by debtor in repurchasing ESOP stock; no

allegations of fraud).

Those courts finding that claims must be based upon rescission, fraud, or other illegality

are either readily distinguishable from the facts of this case or are wrongly decided.  See In re

Montgomery Ward Holding Corp., 272 B.R. 836 (Bankr. D. Del. 2001)(promissory note for

redemption of stock not subordinated; Section 510(b) applies only to claim directly concerning

the stock transaction itself and involving securities fraud); In re Blondheim Real Estate, Inc., 91

B.R. 639 (Bankr. D.N.H. 1988)(provision respecting damages arising from stock transaction

intended to address stock fraud claims, not claims for nonpayment on note); In re Wyeth, 134

B.R. 920 (Bankr. W.D. Mo. 1991)(in refusing to subordinate a stock redemption claim under

Section 510(b), court concluded that purpose of statute was to address only fraud or illegality in

purchase of securities).

The Betacom line of cases comports with the plain meaning of the statute, is consistent

with the underlying policies of the Bankruptcy Code and should be adopted by this Court.

Adoption of the contrary view would subvert the intent of Section 510(b) to distinguish between

true creditors and claimants whose rights originate in equity.

### ii.  The Request for payment of amounts due under a stock repurchase note constitutes damages under Section 510(b)

Where a statute's language is plain, the sole function of the court is to enforce it

according to its terms. Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S. Ct. 3245,

3250 (1982); <u>United States v. Ron Pair Enters., Inc.</u>, 489 U.S. 235, 241, 109 S. Ct. 1026, 1030, 103 L.Ed.2d 290 (1989).

The term "damages" has been defined as:

A pecuniary compensation or indemnity, which may be recovered in the courts by any person who has suffered loss, detriment, or injury, whether to his person, property, or rights, through the unlawful act or omission or negligence of another. <u>Black's Law Dictionary</u> 466, (rev. 4th ed. 1968).

"Every breach of contract gives the injured party a right to damages against the party in breach, unless the contract is not enforceable against the party…" <u>American Law Institute, Restatement of the Law Contracts (2d) §346</u> (1981). Damages recoverable for the breach of an obligation to pay money is the amount due, with interest thereon at the legal rate. <u>AmJur 2d, Damages, Volume 22</u> (1988), *citing* <u>Royal Indem. Co. v. United States</u>, 313 U.S. 289, 61 S. Ct. 995 (1941).

The term "damages", as used in Section 510(b), includes the Defendants' contractual claims for nonpayment on the Stock Redemption Notes, as well as any tort claims such as breach of fiduciary duty. The above construction of the term "damages" in the context of Section 510(b) comports with the holding in <u>In re Vista Eyecare, Inc.</u>, 283 B.R. 613 (Bankr. N.D. Ga. 2002). In <u>Vista</u>, the court concluded that a shareholder's contingent right under an outstanding "put" to have the debtor corporation repurchase his shares was subject to mandatory subordination. The court interpreted the word "damages" as the measure in money of compensation for loss or injury, and noted that damages need not arise from fraud. <u>Id.</u> at 628. Rather Congress inserted the term "damages" because "a claimant's total claim arising from the purchase or sale of a company's securities may be offset by the value, if any, of those securities still held, or disposed of, by the claimant". <u>Id.</u> at 628.

Courts that have read the term "damages" more restrictively are wrong because such

15

decisions involved only consideration of straight debt instruments and therefore did not address

any of the policy implications for subordination under Section 510(b). See Wyeth, 134 B.R. at

921 (use of the term "damages" implies more than a simple debt; at minimum, there must be a

claim for damages resulting from defect in connection with purchase or sale); Blondheim, 91

B.R. at 640 (concept of damages has connotation of recovery other than simple recovery of

unpaid debt due on an instrument).

### iii. The conduct which gives rise to a claim under Section 510(b) need not arise at the time of purchase or sale of the security

There is no question that the Stock Redemption Notes arose from the sale of securities to

MPC. As such, the Claims arising from the Stock Redemption Notes qualify for subordination

under Section 510(b).

The term "arise" means to "spring up, originate, to come into being or notice, to become

operative". Black's Law Dictionary 138 (rev. 4th ed. 1968). The phrase "arising from" signifies

some causal connection. Black's Law Dictionary 108 (6th ed. 1990). The securities' purchase

or sale need only be part of the causal link creating the claim under Section 510(b). See. e.g.,

NAL Financial Group, Inc., 237 B.R. at 231. NAL Financial concluded that the defalcation

forming the basis of the claim need not arise at the time the securities transaction is executed.

The debtor's breach of contract in failing to timely register securities occurred subsequent to

execution of the underlying securities contract. Nevertheless, the movant's cause of action

"arose from" the sale of the security, thereby providing a sufficient nexus for mandatory

subordination. See also In re Geneva Steel Co., 281 F.3d 1173 (10th Cir. 2002)(Section 510(b)

applicable to fraudulent retention claims arising subsequent to the investment); In re Granite

Partners, L.P., 208 B.R. 332 (Bankr. S.D.N.Y. 1997)(id.).

Those courts holding that the fraud or other improper action must occur at the time of the

purchase or sale of security, or arise directly therefrom, take an overly restrictive view of the

cases. <u>See Montgomery Ward</u>, 272 B.R. at 842 (actual purchase and sale of the debtor's security must give rise to the contested claim).

The Stock Redemption Notes were issued in payment for the securities, and MPC's failure to satisfy amounts due under the Stock Redemption Notes is the genesis of the Claims. The Claims are therefore causally linked to the sale of securities and are subsumed within Section 510(b).

MPC has met its burden of demonstrating that the Claims of the Defendants are claims for damages arising out of the purchase or sale of securities and must be subordinated under Section 510(b).

### 3.    <u>Subordination of stock redemption claims is not impacted by ERISA.</u>

The fact that the ESOP is governed by ERISA does not change the result.[4]   In <u>In re Lenco</u>, *supra*, the Department of Labor ("DOL") asserted that Section 510(b) was inapplicable to its claims that arose under ERISA.  In rejecting the DOL's argument, the <u>Lenco</u> court found that the application of Section 510(b) was mandatory, not discretionary, and the Court subordinated the DOL's claim.  <u>Id</u> at 143.  Consistent with the foregoing is <u>Schlein v. Mills (In re Schlein)</u>, 8 F.3d 745, 753 (11th Cir.1993)(Congress did not intend ERISA preemption to ride roughshod over other areas of federal legislation, including the Bankruptcy Code).

The Defendants have failed to demonstrate as a matter of law that ERISA prevents the application of Section 510 of the Bankruptcy Code.

---

[4] ERISA provisions are only tangentially related to this dispute.  MPC has fully addressed the preemption issue in its opposition to the Defendants' motion to withdraw the reference, wherein MPC clearly demonstrates that ERISA is not relevant to a determination of the matters before the Court.  In lieu of repeating its argument herein, MPC incorporates its objection by debtor to motion to withdraw the reference of L.R.D. Mass. 201, filed on August 8, 2003 with the United States District Court and attached hereto as Exhibit E.

4.    **Creditors Cannot Avoid Subordination by Alleging Fraud, Rescission, or Other Tort**

The policy behind Section 510 is to prevent a security holder from "bootstrapping" an equity interest to a general unsecured claim merely by alleging fraud, recission, or some other tort with respect to the sale or issuance of a security. In re Cincinnati Microwave, Inc. 210 B.R. 130, 133 (Bankr.S.D.Ohio 1997), *citing*, In re Washington Bancorporation, 1996 WL 148533 (D.C.1996). In Cincinnati Microwave, the court denied a settlement whereby holders of securities fraud claims would be granted unsecured claim status to participate pari passu with other unsecured creditors. The claims properly fell within the purview of Section 510(b) and, accordingly, the settlement was not fair and equitable as to the bankruptcy estate. 210 B.R. at 132-33.

C.    **The Evidence Conclusively Establishes that the Eggert Attachment and the Harrison Attachment Should Be Avoided Pursuant to 510(c)(2), that The Eggert Attachment is Also Avoidable As A Preference and MPC is Entitled to Judgment as a Matter of Law respecting their Avoidance**

Section 510(c)(2) allows the Court to order that any lien securing a subordinated claim be transferred to the estate once the Court determines that the Stock Redemption Notes should be subordinated.

1.    **The Stock Redemption Notes should be subordinated pursuant to Sections 510(b) and (c). Therefore, the Eggert Attachment and the Harrison Attachment securing the Notes should be transferred to the estate pursuant to 510(c)(2).**

Section 510(c)(2) of the Bankruptcy Code provides that the bankruptcy court may "order that any lien securing such a subordinated claim be transferred to the estate." MPC has

18

conclusively demonstrated that it is entitled to equitable subordination with respect to the Stock Redemption Notes as a matter of law. As such, the Court may order pursuant to Section 510(c)(2) that the liens securing the subordinated Claims, specifically, the Eggert Attachment and the Harrison Attachment, may be transferred to the estate.

### D.    The Eggert Attachment should be avoided as a preference pursuant to <u>Section 547 of the Bankruptcy Code.</u>

There is no genuine issue of material fact as to any element of MPC's case in chief concerning avoidance of the Eggert Attachment under Section 547(b) of the Bankruptcy Code. The elements that must be satisfied to recover in a preference case are:

1. That MPC made a transfer of an interest of MPC in property;

2. That the transfer was to or for the benefit of a creditor of MPC;

3. That the transfer was for or on account of an antecedent debt;

4. That the transfer was made while MPC was insolvent;

5. That the transfer occurred on or within 90 days before the Petition Date; and

6. That the transfer enabled Eggert to receive more than Eggert would receive if--

    (A) the case were a case under chapter 7 of the Bankruptcy Code,

    (B) the transfer had not been made, and

    (C) Eggert received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

11 U.S.C. § 547(b).

### 1.    <u>The Eggert Attachment was a transfer of MPC's property</u>

Eggert has conceded that he obtained the Eggert Attachment in favor of Eggert and against MPC in the amount of $1,829,935. Statement of Undisputed Facts, ¶26.

19

The provisions of Section 541 of the Bankruptcy Code governing property of the estate are fairly broad. <u>DeNadai v. Preferred Capital Markets, Inc.</u>, 272 B.R. 21, 28 (D.Mass. 2001)(citing the language of Section 541(a) of the Bankruptcy Code). Property of the estate is defined as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). The real property that is the subject of the Eggert Attachment is owned by MPC and clearly constitutes estate property. As such, MPC has established this element of Section 547 of the Bankruptcy Code.

**2.    The Eggert Attachment was obtained for the benefit of Eggert, a creditor of MPC.**

Eggert concedes in his answer that he obtained the Eggert Attachment on account of the Eggert Note. Accordingly, the Eggert Attachment was to his benefit as an alleged creditor of MPC. Exh. A, Tab 1, ¶ 19, 20; Tab 2, ¶ 19, 20. Accordingly, MPC has proven this element of Section 547 of the Bankruptcy Code.

**3.    The Eggert Attachment was for or on account of antecedent debt owed by MPC before such attachment was made.**

The Eggert Attachment was obtained to secure payment of the Eggert Note. The Eggert Note was dated December 20, 2000, prior to the granting of the Eggert Attachment. Exh. A, Tab 1, ¶17; Tab 2, ¶17; Tab 3, ¶19. Accordingly, the Eggert Attachment was granted on account of an antecedent debt alleged to be owed before the attachment was obtained.

4.    **The Eggert Attachment was obtained while MPC was insolvent.**

The fourth element is established by virtue of the statutory presumption of insolvency of a debtor during the 90 days immediately preceding the bankruptcy filing.  See 11 U.S.C. § 547(f). ("For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.").  Eggert has presented no evidence to rebut the presumption of MPC's insolvency.  As a result, MPC has proven this element of Section 547 of the Bankruptcy Code as a matter of law.

5.    **The Eggert Attachment occurred on or within 90 days before the Petition Date.**

The evidence is uncontroverted as to this element of MPC's preference claim.  The Eggert Attachment was obtained on January 29, 2003, which is within 90 days of the Petition Date.  Statement of Undisputed Facts, ¶26.   Accordingly, MPC has proven this element of Section 547 of the Bankruptcy Code.

6.    **The Eggert Attachment enabled Eggert to receive more than Eggert would receive if the case were one under Chapter 7, the transfers had not been made and Eggert had received payment of such debts according to the provisions of the Bankruptcy Code.**

Finally, the Eggert Attachment enabled Eggert to receive more than he would have received if the case were one under Chapter 7 of the Bankruptcy Code, the transfer to Eggert had not been made, and Eggert had received payment of such debt pursuant to the provisions of the Bankruptcy Code.

Contemporaneous with the filing of the disclosure statement, the Debtors submitted a liquidation analysis demonstrating that, upon a conversion of the case to Chapter 7, no recovery would be available for unsecured creditors (See Exhibit C to First Amended Disclosure

21

Statement, appended as Exhibit D hereto).   Because Eggert would have received far less than full recovery upon his claim in the event the Eggert Attachment were not obtained, this final element of MPC's preference claim has been met.

Because MPC has conclusively established each element under Section 547(b) of the Bankruptcy Code, MPC is entitled to judgment as a matter of law on Count IV of the Complaint. See 11 U.S.C. §§ 547, 550, 551; Fed. R. Civ. P. 56 (c).  Further, Eggert has not raised affirmative defenses pursuant to 11 U.S.C. §547(c) which would except the Eggert Attachment from avoidance.

### Conclusion

MPC has conclusively established the necessary elements to subordinate the Claims pursuant to Sections 510(b) and (c).  MPC has also established the necessary elements to establish that the Eggert Attachment and the Harrison Attachment should be transferred to the estate pursuant to Section 510(c)(2) of the Bankruptcy Code, and that the Eggert Attachment should be avoided as a preference pursuant to Section 547 of the Bankruptcy Code.  Eggert and Harrison have failed to meet their burdens with respect to any affirmative defenses they might be entitled to raise.  Accordingly, MPC is entitled to judgment as a matter of law as to Counts I, III, IV, and VI of the Complaint.

Respectfully Submitted,

MERRIMAC PAPER COMPANY, INC.,
By its counsel:

Harold B. Murphy BBO# 362610
Andrew G. Lizotte BBO #559609
HANIFY & KING
Professional Corporation
One Beacon Street
Boston, MA  02108
(617) 423-0400

22

Dated: October 14, 2003
386907